**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**KORY DAVID STONE,**

            **Plaintiff,**        **CIVIL ACTION NO. 11-cv-14378**

    **vs.**

                           **DISTRICT JUDGE MARK A. GOLDSMITH**

**COMMISSIONER OF**        **MAGISTRATE JUDGE MONA K. MAJZOUB**
**SOCIAL SECURITY,**

            **Defendant.**
_____/

## REPORT AND RECOMMENDATION

Plaintiff Kory Stone seeks judicial review of Defendant the Commissioner of Society Security's determination that he is not entitled to social security for his physical and mental impairments under 42 U.S.C. § 405(g). (Docket no. 1.) Before the Court are Plaintiff's Motion for Summary Judgment (docket no. 11) and Defendant's Motion for Summary Judgment (docket no. 14). The motions have been referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (Docket no. 3.) The Court has reviewed the pleadings, dispenses with a hearing, and issues this report and recommendation pursuant to Eastern district of Michigan Local Rule 7.1(f)(2).

**I.**    **RECOMMENDATION:**

This Court recommends that Plaintiff's Motion to Remand (docket no. 11) be GRANTED IN PART and DENIED IN PART. Because the Court recommends granting Plaintiff's Motion in part, Defendant's Motion for Summary Judgment (docket no. 14) should be DENIED.

**II.**    **PROCEDURAL HISTORY:**

Plaintiff filed an application for Disability Insurance Benefits and an application for Supplemental Social Security Income with protective filing dates of August 17, 2007, alleging that he had been disabled since April 1, 2005, due to various mental and physical impairments. (TR 127-136.) The Social Security Administration denied benefits. (TR 53, 54.) Plaintiff requested a *de novo* hearing, which was held on August 2, 2010, before Administrative Law Judge (ALJ) Curt Merceille, who subsequently found that the claimant was not entitled to Disability Insurance Benefits because Plaintiff was capable of performing other work in the economy. (TR 24-25.) The Appeals Council declined to review the ALJ's decision (TR 1), and Plaintiff commenced the instant action for judicial review. Plaintiff and Defendant each filed their Motions for Summary Judgment.

## III.    PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE, AND VOCATIONAL EXPERT TESTIMONY

### A.    Plaintiff's Testimony

Plaintiff was 31 years old at the time of the administrative hearing and 25 years old at the time of alleged onset. (*See* TR 129.) Plaintiff has past work experience as a social-service aide, a sales clerk, and a case finder. (TR 35, 63.) Plaintiff testified that he hasn't worked since 2005 because of his mental illness and his back and neck problems. (TR 35-36.) At the time of the hearing, Plaintiff had no source of income. (TR 35.) He testified that he does not socialize, but he goes to NA meetings approximately once a week. (TR 39.) He does not go out of his house very often, but he does go to the grocery store once or twice a month. (TR 39.) Plaintiff testified that he likes to read and use the Internet to access his Myspace and Facebook pages. (TR 40-41.) Plaintiff cooks a little, but he does not clean. (TR 40.) Plaintiff testified that he currently lives with his mother. (TR 39.)

With regard to his mental illness, Plaintiff testified that his latest diagnosis was bipolar II.

2

(TR 36.)  In general, this leaves him without any energy, but at times when he is manic, he has high energy but high anxiety.  (TR 36.)  With regard to his physical impairments, Plaintiff testified that he had surgery in 2000 and that following that surgery, he was diagnosed with degenerative disc disease.  (TR 36.)  This causes him to have chronic pain in his neck and down his arm into his hands.  (TR 36.)  Plaintiff testified that the pain generally runs down his left (dominant) arm into his hand, which causes it to feel numb or prickly.  (TR 42.)  Plaintiff stated that he experiences this every day, for most of the day.  (TR 42.)

To treat his impairments, Plaintiff takes the following medications: (1) Lopid; (2) Zocor; (3) Lisinopril; (4) Restoril; (5) Motrin 800; (6) Robaxin; (7) Neurontin; (8) Ultram; (9) Flexeril; (10) Prilosic; (11) Lamictal; (12) Wellbutrin SR; (13) Abilify; (14) ProAir; and (15) Albuterol Sulfate, a nebulizer medicine.  (TR 36.)  Additionally, Plaintiff takes seven vitamin supplements.  (TR 37.)  Each of these medications and supplements is taken a minimum of once daily.  (TR 36-37.)  Plaintiff testified that while his medications give him some relief, they also cause confusion and fatigue.  (TR 37.)  Further, Plaintiff testified that he has received epidural injections, he goes to the chiropractor on and off, and he receives trigger-point injections every couple of months.  (TR 37.)

Plaintiff testified that he sees his family doctor, Dr. Theresa Sherman, for his physical ailments; Dr. Sherman also gives him his injections.  (TR 37-38.)  For his mental illnesses, Plaintiff testified that he visits with a nurse practitioner, Jennifer Kreiner, "on a regular basis."  (TR 38.)  He testified that these appointments last approximately 15 minutes and that they discuss his symptoms of mania and depression and whether he's getting enough sleep; she also adjusts his medication when necessary.  (TR 44-45.)  Plaintiff also testified that he met with another therapist, Dr. Magoon, one time as part of a yearly review.  (TR 38.)  Dr. Magoon and Nurse Kreiner both work for New Passages Rehabilitation Services where Plaintiff received treatment.

3

Plaintiff testified that his physical condition limits him to lifting about 15 pounds and that he can sit for about an hour but can stand for only five or ten minutes. (TR 38-39.) And because his activity level has decreased due to his physical problems and his medications, he has gained approximately 100 pounds over the last two years, which makes his back and neck pain worse; at the time of the hearing, he weighed approximately 340 pounds. (TR 41-42.) Plaintiff testified that he can only hold a book in one hand for approximately 20 minutes before having to shift to the other hand, and he can only type on a keyboard for 20 to 30 minutes before he has to take a break. (TR 43.) Plaintiff also testified that because of his decreased energy, he has to take three one-hour naps every day; this has been the case since he was 16 years old. (TR 44.)

### B.     Medical Record

#### 1.     Plaintiff's Neck and Back Pain

On September 2, 2005, Plaintiff had an MRI that confirmed disc protrusions and a spur causing mild right neural foramen narrowing at C3-4, and small disc protrusions and spur eccentric to the left at C5-6. (TR 389.) On December 23, 2005, he complained to Dr. Sherman that he felt rundown and depressed; a physical examination showed that Plaintiff was neurologically intact. (TR 402; *see* TR 20.) Dr. Sherman diagnosed hypertension, migraines, and hyperlipidemia. (TR 402.) On April 15, 2006, Dr. Sherman administered a steroid injection because Plaintiff had pain radiating around his lower back and upper thighs. (TR 402.) Plaintiff was advised to perform stretching exercises. (TR 402.)

Plaintiff reported continuing problems with pain at follow-up appointments on August 7, 2006. (TR 411.) In January 2007, a physical exam found that Plaintiff was intact from a musculoskeletal and neurological perspective. (*See* TR 21). Plaintiff reported additional pain in March 2007, and on May 1, 2007, Dr. Sherman administered trigger-point injections of Xylocaine.

4

(TR 418, 419.)  Dr. Sherman administered an injection of Depo-Medrol on June 11, 2008.  (TR 419.)  On July 31, 2007, Plaintiff complained of upper-back and neck pain, and on August 29, 2007, an MRI showed mild degenerative changes; Dr. Sherman administered more trigger-point injections.  (TR 435; *see* TR 21.)

On January 18, 2008, Plaintiff reported back pain when he asked Dr. Sherman to complete his paperwork for disability benefits; Dr. Sherman diagnosed him with cervical/lumbar disc disease.  (TR 593.)  On March 4, 2008, Plaintiff again reported increased pain in his back, for which Dr. Sherman administered more trigger-point injections and prescribed Neurontin.  (TR 593.)

Plaintiff's May 2008 physical-therapy report notes that his subjective complaints of pain were not supported by objective findings.  (*See* TR 21.)  The report noted that his strength and range of motion were normal and that he had a sedentary lifestyle.  (*See* TR 21.)  On June 17, 2008, Plaintiff complained of muscle spasms and tightness in his back; Dr. Sherman performed trigger-point injections.  (TR 642.)  On July 16, 2008, Plaintiff complained of increased spasms in his back; Dr. Sherman performed more trigger-point injections.  (TR 642.)  Also in July 2008, an examiner noted that Plaintiff had no true motor deficits.  (*See* TR 21.)

On September 4, 2008, Plaintiff reported no improvement.  (TR 641.)  On September 11, 2008, an MRI showed posterior central disc protrusion at L3-4 with small posterior annular tear causing mild ventral impression on the thecal sac, moderate bilateral foraminal narrowing at L3-4 level, and post-operative changes with scarring at L4-5.  (TR 651-52.)  A second MRI showed disc bulges from C3-4 and C5-6 foraminal narrowing.  (TR 653.)  Dr. Sherman opined that Plaintiff did not require surgery because he had "just a tiny disc displacement."  (TR 21-22.)

In November 2008, Plaintiff left his physical therapy sessions because he did not want to do any exercise therapy.  (*See* TR 22.)  His discharge also indicates that there was no objective support

5

for his complaints and that he had a poor attendance record.  (*See* TR 22.)

On February 23, 2009, Dr. Sherman completed a Multiple Impairment Questionairre, in which she opined that Plaintiff had symptoms of chronic neck and lower-back pain with numbness and tingling that was constant and exacerbated by physical activities and prolonged sitting and standing. (TR 623-24.)  She noted that the symptoms were present since 2005.  (TR 628.)

In June 2009, Plaintiff presented with increased back pain; Dr. Sherman administered additional trigger-point injections.  (TR 639.)  On April 16, 2010, Plaintiff again reported increased back pain associated with an injury; Dr. Sherman again administered trigger-point injections.  (TR 817.)  And on May 19, 2010, Plaintiff once again reported increased back pain.  (TR 815.)

### 2.    Plaintiff's Mental Impairments

In 2001, Plaintiff reported panic attacks, depression, and hallucinations; he also indicated that he would rather stay at home than work.  (*See* TR 17.)  He was diagnosed with alcohol dependence, polysubstance abuse, anxiety, and depression.  (*See* TR 17.)  In June 2003, Plaintiff had a relapse of depression and hallucinations, and in September 2003, he was diagnosed with bipolar disorder and depression, with a good prognosis.  (*See* TR 17.)  Plaintiff received treatment for his disorders beginning in 2003, and by January 2004, his records indicate that he was non-compliant with his medications; he was diagnosed with schizoaffective disorder.  (*See* TR 17.)  In January 2004, his records indicate that he was having problems with cognitive functioning, dealing with the public, social skills, and impulse control; he did, however, have strengths in the areas of daily activities, work, and responsibility.  (*See* TR 17.)  In May 2005, Plaintiff relapsed back into the abuse of drugs and alcohol.  (*See* TR 17.)  In June 2005, his records indicate that his memory was intact and his judgment and insight were fair.  (*See* TR 18.)  And in September 2005, while Plaintiff reported depression and anxiety, he spoke coherently and logically, his affect was appropriate, he

6

had no psychotic symptoms, paranoid feelings, or suicidal thoughts, and he stated that he had been controlling his temper well. (*See* TR 18.) On December 23, 2005, Dr. Sherman diagnosed Plaintiff with depression. (TR 402.) His records at this time also indicate that he was not compliant with his case-management appointments; and he stated that he was not ready to begin working. (*See* TR 18.)

On February 4, 2006, Plaintiff was evaluated by Dr. Spencer Ballard, to whom Plaintiff reported symptoms of depression, irritability, anxiety, and racing thoughts. (TR 338.) Dr. Ballard diagnosed Plaintiff with bipolar II disorder and polysubstance abuse. (TR 340.) In August 2006, Plaintiff left his treatment program against the advice of his treating physicians. (*See* TR 18.)

On February 23, 2007, Plaintiff was seen for a follow-up, where Dr. Ballard noted a past history of suicide attempts. (TR 344.) He also indicated that he was consuming alcohol daily. (*See* TR 18.) On May 15, 2007, Plaintiff saw Dr. Duncan Magoon, to whom he reported depression, mood swings, and a history of drug abuse. (TR 631.) In November 2007, Plaintiff was examined by Darlene Doerscher, under the supervision of Dr. Marianne Goergen, as part of a State psychiatric consult. (*See* TR 18.) Ms. Doerscher diagnosed Plaintiff with bipolar disorder, alcohol dependence in sustained partial remission, and a history of substance abuse. (*See* TR 18.)   She noted that he could care for himself and perform household chores and that he expressed a desire to return to college. (*See* TR 18.) On December 7, 2007, Plaintiff saw Dr. David Dickenson, who noted that Plaintiff had depressed mood, hyperactive motor activity, a sad affect, some flight of ideas, paranoid and obsessive thought content, and some obsessive-compulsive symptoms. (TR 807-09.) Dr. Dickenson also diagnosed Plaintiff with bipolar II disorder and polysubstance abuse, although the latter was in full remission. (TR 811.) Dr. Dickenson saw Plaintiff again on February 22, 2008. (TR 799.)

On January 18, 2008, Plaintiff told Dr. Sherman that his medications had improved his

depression, but they made him sluggish and tired. (TR 593.) On March 6, 2008, Plaintiff saw Dr.

Ballard for a follow-up appointment. (TR 789.) His examination revealed depressed mood and

fleeting visual hallucinations. (TR 790.) He was seen again on May 13, 2008, and on June 10, 2008;

there were no significant changes to his condition. (TR 681-87; 676-80.) Plaintiff, however,

indicated in May that he had been off of his medication for two months. (*See* TR 19.) On July 3,

2008, Plaintiff reported auditory hallucinations and a relapse of opiate abuse. (TR 749.) He was

seen for follow-up appointments on July 19, 2008, and September 13, 2008, with no significant

changes. (TR 671-75; 665-70.)

On October 31, 2008, his treating nurse practitioner, Jennifer Kreiner, completed a

Psychiatric/Psychological Impairment Questionnaire. (TR 613-20.) She diagnosed him with bipolar

disorder and post-traumatic stress disorder. (TR 613.) On February 23, 2009, in his Multiple

Impairment Questionnaire, Dr. Sherman diagnosed Plaintiff with chronic bipolar II disorder. (TR

622.) Her clinical findings included mood swings, self-injurious behavior, delusions/paranoia,

anxiety, insomnia, poor concentration, and hostility when not on medications. (TR 622.) She noted

that Plaintiff had breakthrough anxiety even on his medications. (TR 627.) In May 2009, Plaintiff

again presented with passive thoughts of suicide and issues with drug and alcohol addiction. (*See*

TR 20.) In June 24, 2009, in a Psychiatric/Psychological Impairment Questionnaire, Dr. Sherman

diagnosed Plaintiff with bipolar II disorder and polysubstance abuse. (TR 657-64.) Her clinical

findings included poor memory, appetite disturbance, sleep disturbance, personality change, mood

disturbance, emotional lability, delusions or hallucinations, substance dependence, recurrent panic

attacks, anhedonia or pervasive loss of interests, psychomotor agitation or retardation, paranoia or

inappropriate suspiciousness, feelings of guilt/worthlessness, difficulty thinking or concentrating,

suicidal ideation or attempts, oddities of thought, perception or behavior, blunt, flat or inappropriate

8

affect, decreased energy, manic syndrome, obsessions or compulsions, generalized persistent anxiety, somatization, and pathological dependence or passivity. (TR 658.) She noted that these symptoms were present since August 2004. (TR 664.) On March 14, 2010, Plaintiff had a follow-up appointment with Dr. Magoon, where he completed the same Questionnaire. (TR 771-79.) His findings were similar to those of Dr. Sherman and Nurse Kreiner. (TR 771-79.) He opined that Plaintiff's life was "destroyed by Bipolar Disorder." (TR 778.)

### C.      The Vocational Expert

The Vocational Expert (VE) testified that Plaintiff's prior work experience was light and skilled, light and semi-skilled, and light and unskilled. (TR 46.) The ALJ asked the VE to consider an individual who (1) was of the same age, education, and past work experience as Plaintiff; (2) was limited to light work; (3) was unable to climb ladders, ropes, scaffolds, ramps, or stairs; (4) could only occasionally balance, stoop, or crouch, kneel, or crawl; (5) must avoid exposure to hazards; (6) must be limited to work involving one- and two-step tasks, occasional decision making, and occasional changes in the work environment; and (7) must have no interaction with the public and only superficial interaction with co-workers and supervisors. (TR 47.) The VE testified that such an individual could work as an inspector, a dishwasher, as an administrative-support worker, a stock clerk, a mail sorter, or an assembly worker. (TR 47.)

The ALJ then asked the VE to assume that the same individual would require a sit–stand option. (TR 47.) The VE testified that with this added limitation, he would delete the dishwasher, janitor, and mail sorters from the list and would reduce the amount of available jobs for the administrative support workers and assemblers. (TR 47-48.) The ALJ then asked the VE to assume that the same individual would be limited to sedentary work instead of light work. (TR 48.) The VE testified that such an individual would still be able to work as an administrative support worker,

9

an assembler, a machine operator, a stock handler, a hosting clerk, a surveillance system monitor, or an inspector; although the number of jobs in each category would, again, be more limited.  (TR 48.)  The ALJ finally asked the VE if Plaintiff would be employable if the ALJ found his testimony credible; the VE said, "No," because Plaintiff indicated that he could not maintain a regular schedule.  (TR 48-49.)

Plaintiff's attorney then asked the VE to consider an additional limitation whereby the hypothetical individual was unable to work in close proximity to other workers based on psychological or psychiatric symptoms.  (TR 49.)  The VE testified that he could not really answer the question because all jobs generally require contact with other individuals.  (TR 49-50.)  Plaintiff's attorney then asked the ALJ to consider that the individual could not use his dominant hand, and the VE testified that such an individual could only work as a surveillance system monitor.  (TR 50.)  Finally, Plaintiff's attorney asked the VE to opine "as to how much an individual could be off task because of medical impairments, during a typical work day, and still be able to sustain employment."  (TR 50.)  The VE said that a person needs to complete about 80% of what an average worker produces to remain employable.  (TR 50.)  The VE testified that if Plaintiff was off-task three hours a day, he would not be employable.  (TR 51.)

## IV.    ADMINISTRATIVE LAW JUDGE'S DETERMINATION

The ALJ found that although Plaintiff met the disability insured status requirements through September 30, 2005; had not engaged in substantial gainful activity since April 1, 2005; and suffered from severe schizoaffective disorder, dependent personality disorder, a history of substance abuse, degenerative changes to the cervical spine, status post lumbar laminectomy, obesity, chronic obstructive pulmonary disease, a history of condyloma, and migraine headaches; he did not have an impairment or combination of impairments that meets or equals the Listing of Impairments.  (TR

10

12.)  The ALJ found that Plaintiff's allegations regarding the extent of his symptoms were not totally credible (TR 17), and although Plaintiff could not perform his past work, he had the ability to perform a limited range of sedentary work, and there were jobs that existed in significant numbers in the economy that Plaintiff could perform.  (TR 24-25.)  Therefore, he was not suffering from a disability under the Social Security Act at any time from April 1, 2005, through the date of the ALJ's decision.  (TR 25.)

## V.     LAW AND ANALYSIS

### A.     Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997).  Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528.  It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence, or decide questions of credibility.  *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole.  *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial

11

evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.      Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five-step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)     Plaintiff was not presently engaged in substantial gainful employment; and

(2)     Plaintiff suffered from a severe impairment; and

(3)     the impairment met or was medically equal to a "listed impairment;" or

(4)     Plaintiff did not have the residual functional capacity (RFC) to perform relevant past work.

*See* 20 C.F.R. § 404.1520(a)-(f). If Plaintiff's impairments prevented Plaintiff from doing past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education, and past work experience to determine if Plaintiff could perform other work. If not, Plaintiff would be deemed disabled. *See id.* at § 404.1520(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

### C.    Analysis

The Social Security Act authorizes "two types of remand: (1) a post judgment remand in conjunction with a decision affirming, modifying, or reversing a decision of the [Commissioner] (a sentence-four remand); and (2) a pre-judgment remand for consideration of new and material evidence that for good cause was not previously presented to the [Commissioner] (a sentence-six remand)." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 174 (6th Cir. 1994) (citing 42 U.S.C. § 405(g)).  Under a sentence-four remand, the Court has the authority to "enter upon the pleadings and transcript of the record, a judgment affirming, denying, or reversing the decision of the [Commissioner], with or without remanding the cause for a hearing.  42 U.S.C. § 405(g).  Where there is insufficient support for the ALJ's findings, "the appropriate remedy is reversal and a sentence-four remand for further consideration." *Morgan v. Astrue*, 10-207, 2011 WL 2292305, at *8 (E.D.Ky. June 8, 2011) (citing *Faucher*, 17 F.3d at 174).  Plaintiff argues that Defendant's decision should be reversed or remanded for three reasons: (1) the ALJ failed to properly weight the medical opinions of record; (2) the ALJ failed to properly evaluate Plaintiff's credibility; and (3) the VE's testimony was flawed because the ALJ's hypothetical was improper.[1]  (Docket no. 11-1 at 10, 16, 18.)

---

[1]With regard to the VE's testimony, Plaintiff argues that despite finding that Plaintiff has "moderate difficulty" with concentration, persistence, or pace, the ALJ did not place any such limitations in the hypothetical questions presented to the VE.  (Docket no. 11-1 at 11.)  Instead, the ALJ limited the RFC to work involving "one or two step tasks requiring only occasional decision-making and occasional changes in the work setting."  (TR 15.)  Defendant contends that "an ALJ 'is required to incorporate [into a hypothetical] only those limitations accepted as credible by the finder of fact.'"  (Docket no. 14 at 16 (citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993.)  Even assuming, arguendo, that Defendant is correct, because the Court recommends remanding for determination of Plaintiff's RFC after affording greater weight to the opinions of Dr. Sherman and Ms. Kreiner, Plaintiff's argument is moot; therefore, the Court will not address Plaintiff's third issue.

13

### 1.    Weight of the Medical Opinions

The ALJ must give a treating physician's opinion complete deference if it is supported by clinical and laboratory diagnostic evidence and it is not inconsistent with the other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2).  It is equally well settled that the ultimate issue of disability is reserved to the Commissioner and not the treating or examining physician.  *Kidd v. Comm'r*, 283 Fed. Appx. 336, 341 (6th Cir. 2008).  Thus, when a medical or non-medical source offers an opinion on "an issue reserved to the Commissioner, such as whether the claimant is disabled, the ALJ need not accord that opinion controlling weight."  *Id.* (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)).  The opinion of an examining source is generally accorded more weight than is the opinion of a source who did not examine the claimant.  20 C.F.R. § 404.1527(c)(1).  The opinion of a state agency medical or psychological consultant is reviewed in the same manner as is the opinion of a nonexamining physician or psychologist.  20 C.F.R. §404.1527(e).

The Commissioner requires its ALJs to "always give good reasons in [their] notice of determination or decision for the weight [they] give [a] treating source's opinion."  20 C.F.R. § 404.1527(c)(2).  Those good reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Wilson v. Comm'r*, 378 F.3d 541, 544 (6th Cir. 2004) (citing Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *5 (1996)).  If the opinion of a treating source is not afforded controlling weight, an ALJ must apply certain factors in determining what weight to give the opinion, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and

14

the specialization of the treating source. *Wilson*, 378 F.3d at 544 (citation omitted). Even then, a finding that a treating-source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to controlling weight, not that the opinion should be rejected. Social Security Ruling (SSR) 96-2p, 1996 WL 374188, at *4.

Plaintiff argues that the ALJ erred when he "gave little weight to the opinions of treating psychiatrist Dr. Magoon," "gave no weight to the opinions from treating psychiatric nurse practitioner Ms. Kreiner," "gave no weight to the opinions from treating physician Dr. Sherman," and "gave significant weight to the opinions from a non-examining psychiatric consultant. (Docket no. 11-1 at 12.) With regard to Dr. Magoon's opinions, Plaintiff contends that his opinions were not contradicted by other substantial evidence and that they were based on appropriate clinical and diagnostic techniques. (*Id.* at 13.) With regard to Dr. Sherman's opinions, Plaintiff contends that the ALJ was not permitted to reject Dr. Sherman's findings regarding Plaintiff's mental limitations simply because she is not a mental health specialist, particularly when her findings were supported by clinical evidence. (*Id.* at 15 (citing *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987)).) Moreover, Plaintiff argues, the ALJ cited to no opinions contradictory to Dr. Sherman's. (*Id.* at 16.) Additionally, Plaintiff argues that the ALJ failed to weigh each of the doctors' medical opinions under the appropriate factors. (*Id.* at 14, 16.) Plaintiff acknowledges that Ms. Kreiner is not an "acceptable medical source," but her opinions must still be weighed under the appropriate framework. (*Id.* at 14 (citing *Cole v. Comm'r*, 662 F.3d 931, 939 (6th Cir. 2011)).)

Defendant contends that the ALJ gave "specific, nuanced reasons for not crediting Dr. Magoon's, Dr. Sherman's, and Ms. Kreiner's opinions. (Docket no. 14 at 11.) With regard to Dr. Magoon, Defendant asserts that the ALJ appropriately weighed his opinions because Dr. Magoon

"did not actually evaluate or treat Plaintiff at the time he completed the evaluation [in 2010] . . . ; nor were these findings present in his only previous evaluation of Plaintiff in May 2009." (*Id.* at 12.) With regard to Dr. Sherman, Defendant argues that the ALJ was justified in rejecting her opinions because she is not a mental health expert and because she had not treated Plaintiff's mental impairments. (*Id.*) Additionally, Defendant states, the ALJ "found that Dr. Sherman's conclusions regarding Plaintiff's physical limitations lacked objective support, and were inconsistent with Plaintiff's 'apparent ability to perform various physical activities, . . . his fairly conservative course of treatment,' and generally unremarkable physical examination findings." (*Id.* at 12-13.) With regard to Ms. Kreiner's opinions, Defendant argues that the ALJ did not simply dismiss her opinions, he found that "her 'records did not document the numerous and varied symptoms and limitations that she indicated in her opinion.'" (*Id.* at 13.)

> a.      **Dr. Magoon's Opinion**

The ALJ gave Dr. Magoon's Opinion "little weight" because his "assessment [was] not well supported by objective clinical findings." (TR 20.) In his discussion of Dr. Magoon's opinion, the ALJ noted that Dr. Magoon had a limited treatment history with Plaintiff. (TR 20.) The ALJ also opined that Dr. Magoon's assessment in May 2009 was "mostly unremarkable." (TR 20.) Plaintiff notes that "Dr. Magoon treated [Plaintiff] as part of a team at New Passages Behavioral Health." (Docket no. 11-1 at 14.) Plaintiff argues that "[a]lthough the Sixth Circuit has not addressed this issue, several Circuit Courts have held that opinions from doctors who are part of a treatment team are entitled to treating physician status regardless of the length of treatment." (*Id.* (citing *Shontos v. Barnhart*, 328 F.3d 418, 425-26 (8th Cir. 2003); *Benton ex rel. Benton v. Barnhart*, 331 F.3d 1030, 1037-39 (9th Cir. 2003)).)

Although Plaintiff argues that "all of the factors in the Regulations . . . weigh in favor of

16

crediting Dr. Magoon's opinions," the Court finds that the ALJ did not err in affording Dr. Magoon's opinions "little weight." The ALJ considered the length of the treatment relationship and the frequency of examination, finding that it was "limited;" he considered the nature and extent of the treatment relationship; and he found the opinion "not well supported." Moreover, the ALJ did not reject Dr. Magoon's opinion outright; he merely afforded it little weight. Thus, the ALJ's decision is supported by the evidence in the case record and is sufficiently specific to make clear his reason for the decision.

### b.     Dr. Sherman's Opinion

The ALJ entirely rejected Dr. Sherman's numerous opinions because she "had not treated [Plaintiff's] mental impairments, and she is not a mental health expert." (TR 22; *see also* TR 23.) He also found that "Dr. Sherman's limitations . . . appear to be based heavily on [Plaintiff's] subjective allegations rather than actual clinical findings made during her treatment sessions." (TR 23.) The ALJ further noted that "the record has continually documented minimal objective findings to support a severe back impairment with physical examination findings generally unremarkable." (TR 23.) The ALJ instead chose to give "significant weight" to a state agency psychiatric consultant with regard to Plaintiff's mental impairments; it does not appear that the ALJ relied on any opinion in particular with regard to Plaintiff's physical impairments. (TR 19.)

> Plaintiff draws the Court's attention to the Ninth Circuit's decision in *Sprague:*
>
> While the medical profession has standards which purport to restrict the practice of psychiatry to physicians who have completed residency training programs in psychiatry, . . . it is well established that primary care physicians (those in family or general practice) "identify and treat the majority of Americans' psychiatric disorders."

*Sprague*, 812 F.2d at 1232 (citing C. Tracy Orleans, Ph.D., Linda K. George, Ph.D., Jeffrey L. Houpt, M.D., and H. Keith H. Brodie, M.D., How Primary Care Physicians Treat Psychiatric

Disorders: A National Survey of Family Practitioners, 142:1 Am.J. Psychiatry 52 (Jan. 1985)).

Thus, Plaintiff contends, even though Dr. Sherman wasn't Plaintiff's psychiatrist, the ALJ erred

when he completely rejected her opinion. The Court agrees. Even though the ALJ was permitted

to assign less than controlling weight to Dr. Sherman's opinion for the reasons that he discussed in

his decision, Defendant has previously stated that such an opinion should not be entirely rejected.

Dr. Sherman was Plaintiff's primary care physician, and she saw him regularly. Moreover, her

opinions are supported by the opinions of Dr. Magoon and Ms. Kreiner. The only contradictory

opinion comes from the state agency consultant, whom the ALJ is supposed to weigh as if she were

a nonexamining physician. *See* 20 C.F.R. §404.1527(e). Therefore, the Court recommends granting

Plaintiff's Motion; this matter should be remanded for a decision that affords greater weight to Dr.

Sherman's opinion.

### c.       Ms. Kreiner's Opinion

The ALJ rejected Ms. Kreiner's opinion in its entirety because she was not a physician and

because Plaintiff's overall treatment record "did not document the numerous and varied symptoms

and limitations that she indicated in her opinion." (TR 19-20.) While the ALJ may afford Ms.

Kreiner's opinion little weight, he may not entirely reject her opinion simply because she is not a

licensed physician. *Cole*, 662 F.3d at 939. The ALJ must still articulate his reasons for rejecting

her opinion so that any subsequent reviewers can determine the weight he gave the opinion and the

reasons for that weight. *Wilson,* 378 F.3d at 544. Therefore, the Court recommends granting

Plaintiff's Motion; this matter should be remanded for a decision that affords greater weight to Ms.

Kreiner's opinion or that more clearly articulates the reasons for affording her opinion no weight.

### 2.       Plaintiff's Credibility

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight

and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Commissioner*, 127 F.3d 525, 531 (6th Cir. 1997). But Credibility assessments are not insulated from judicial review. Despite the deference that is due, such a determination must nevertheless be supported by substantial evidence. *Id.* An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p. "It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.* "The adjudicator may find all, only some, or none of an individual's allegations to be credible" and may also find the statements credible to a certain degree. *See id.*

Further, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2). The ALJ must consider: (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measures used to relieve the pain, and (7) functional limitations and restrictions due to the pain. *See* 20 C.F.R. § 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994) (applying these factors).

The ALJ found that "[t]he claimant's statements concerning the intensity, persistence and

limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (TR 17.)  Plaintiff asserts that this language suggests that the ALJ predetermined the RFC and then found Plaintiff not credible because his symptoms did not match the RFC.  (Docket no. 11 at 18.)  While the Court agrees with Plaintiff that such a finding, if made, would be erroneous, the Court does not agree that the ALJ made such a finding.  The ALJ's comment refers to the RFC located in the section heading of his decision, which is analyzed therein.  Thus, when the ALJ stated that Plaintiff's limitations were not credible "to the extent they are inconsistent with the RFC," the ALJ was merely stating that he developed the RFC based on the limitations that he did find credible.  He then continues to discuss the reasons for his determination.  Therefore, the Court finds that the ALJ's decision in this regard was not contrary to law.

Plaintiff also argues that the ALJ was not permitted to determine whether the clinical and objective findings were insufficient without relying on other medical evidence or authority in the record, (*id.* at 17 (citing *Mathious v. Barnhart*, 490 F.Supp.2d 833, 847 n.14 (E.D. Mich 2007))), and that Plaintiff's performance of daily activities do not contradict his testimony (with regard to his physical or mental limitations) as the ALJ suggests (*id.*).  Moreover, Plaintiff argues, the ALJ erred when he found that Plaintiff's treatment was "conservative."

Regardless of Plaintiff's characterization, the ALJ refers to objective evidence in finding against Plaintiff's credibility.  For example, the ALJ noted that "in 2001 [Plaintiff] stated that he did not want to work, and rather that he wanted to stay home." (TR 17.)  He found that in January 2004, "it was noted numerous times that the claimant was non-compliant with medications." (TR 17.)  In 2006, Plaintiff "left treatment . . . against the advice of his treating physicians." (TR 18.)  In 2005, Plaintiff "was not compliant with his case management appointments," and although "he continued to do well with regard to performing activities of daily living, . . . he stated that he was not ready to

20

begin working."  (TR 18.)   Again, in January 2006, Plaintiff was not compliant with case management appointments.  (TR 18.)  The ALJ continues through Plaintiff's history in 2007, 2008, and 2009, wherein the ALJ notes that Plaintiff had mostly unremarkable examinations except for times when he was off of his medication or using drugs or alcohol.  (TR 18-19.)

Thus, even if the Court disagrees with the ALJ, the substantial deference afforded to the ALJ in matters of credibility weighs against Plaintiff in this matter; the ALJ's determination is supported by the evidence in the record and is sufficiently specific to make clear to Plaintiff and the Court the weight given to Plaintiff's statements and the ALJ's reasons for that weight.  The ALJ could reasonably conclude that Plaintiff's subjective complaints regarding the severity of his symptoms and the impact of those symptoms were not entirely credible.  The ALJ's determinations regarding Plaintiff's credibility are supported by substantial evidence, and therefore, the Court recommends denying Plaintiff's Motion with regard to this issue.

## VI.     CONCLUSION

This case should be remanded under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  Because a sentence-four remand is warranted, Plaintiff's Motion for Summary Judgment (docket no. 11) should be GRANTED IN PART and should be remanded for a decision affording greater weight to the opinions of Dr. Sherman and Ms. Kreiner; Plaintiff's Motion should be DENIED IN PART with respect to his remaining arguments.  And because the Court recommends granting Plaintiff's Motion in part, Defendant's Motion for Summary Judgment (docket no. 14) should be DENIED.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for

in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: February 7, 2013          s/ Mona K. Majzoub
                                 MONA K. MAJZOUB
                                 UNITED STATES MAGISTRATE JUDGE

## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: February 7, 2013          s/ Lisa C. Bartlett
                                 Case Manager